**Mr. and Mrs. Barry PICK**

**v.**

**AMERICAN MEDICAL SYSTEMS, INC.**

**Civil Action No. 94–1729.**

United States District Court, E.D. Louisiana.

Feb. 27, 1997.

Harry Hoskins, Frank B. Hayne, New Orleans, LA, Frank Sdoan, Covington, LA, for plaintiffs.

Quentin F. Urquhart, Jr., New Orleans, LA, Steven Glickstein, New York City, Terrance Adamson, Washington, DC, Daniel Johnson, Minnetonka, MN, for defendant.

## ORDER AND REASONS

BERRIGAN, District Judge.

The defendant, AMERICAN MEDICAL SYSTEMS, INC. ("AMS"), has filed a motion (1) to exclude testimony by plaintiffs' experts regarding whether Barry Pick's penile prothesis caused him to develop autoimmune disease and/or systemic coccal disease; (2) and for summary judgment dismissing those particular claims. For the reasons that follow, the Court rules that:

1. The motion to exclude testimony by plaintiffs' experts is PARTIALLY GRANTED and PARTIALLY DENIED;

2. Summary judgment as to whether silicone can cause autoimmune disease (general causation) is DEFERRED;

3. Summary judgment as to whether the silicone in Pick's prothesis caused or aggravated his condition (specific causation) is GRANTED;

4. Summary judgment as to systemic coccal disease, both as to general and specific causation is GRANTED.

5. Pursuant to Fed. R. Civ. Pro. 54(b), the Court finds that there is no just reason for delay and directs the entry of judgment dismissing the plaintiff's claims for autoimmune disease and systemic coccal disease.

In 1982, an AMS Penile Implant was surgically implanted in Barry Pick. The plaintiff, LAURA PICK ("PICK") contends that AMS failed to warn of the risk of immune related connective tissue disorders and health risks associated with the silicone and that the implant was unreasonably dangerous because of the silicone content. PICK alleges that Bar-

ry Pick suffered from various disorders which were caused or aggravated by the silicone and/or coccal bacteria from the implant. The implant was removed in 1993. Barry Pick died after this litigation was filed.

## I. Legal Standards for Admissibility— Daubert

In *Daubert v. Merrell Dow Pharmaceuticals Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the United States Supreme Court revised the standards for admitting scientific evidence under the Federal Rules of Evidence. The court began with the "baseline" principle that "all relevant evidence is admissible" unless excepted by the Constitution, a statute or rule and that the standard of relevance "is a liberal one." Fed.R.Evid. 402; *Daubert,* 509 U.S. at 585–589, 113 S.Ct. at 2793–2794.

The Court found that Rule 702[1] obliges the trial judge to act as a "gatekeeper"[2] and screen scientific evidence for reliability and relevance. Regarding reliability, the Court said:

> The subject of an expert's testimony must be "scientific ... knowledge." The adjective "scientific" implies a grounding in the methods and procedures of science. Similarly, the word "knowledge" connotes more than subjective belief or unsupported speculation ...

*Daubert,* 509 U.S. at 589–590, 113 S.Ct. at 2795.[3]

The Court suggested several factors in determining reliability. Of particular importance is whether "the theory or technique ... can be (and has been) tested." *Daubert,* 509 U.S. at 593, 113 S.Ct. at 2796. Another factor is whether the theory or technique has been subjected to evaluation by peer review and publication.[4] A third factor is the known or potential rate of error in the technique and the existence and maintenance of standards governing its operation. A final consideration is whether the theory or technique has been generally accepted in the relevant scientific community.[5]

The Court, stressed that the standard under Rule 702 is a "flexible one." The Court emphasized also that the focus of the inquiry is "solely on principles and methodology, not on the conclusions that they generate." *Daubert,* 509 U.S. at 595, 113 S.Ct. at 2797.

The Court favored admission of evidence on the borderline. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional, and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596, 113 S.Ct. at 2798. At the same time, the Court recognized the significant difference between "the quest for truth in the courtroom and the quest for truth in the laboratory." *Daubert,* 509 U.S. at 596–597, 113 S.Ct. at 2798. Scientific inquiry must necessarily be broad and far-reaching, with the reliability of theories under continuous study and revision. Resolution of a legal dispute, on the other hand, involves binding, final judgments which cannot be based on conjecture. Consequently, there may well be "authentic insights and innovations" of science that are nonetheless inadmissible in a court of law. *Daubert,* 509 U.S. at 595–599, 113 S.Ct. at 2798–2799.

---

1. "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

2. *Daubert,* 509 U.S. at 595, 113 S.Ct. at 2798.

3. Regarding relevance, the Court held that Rule 702 "requires a valid scientific connection to the pertinent inquiry ..." *Daubert,* 509 U.S. at 592, 113 S.Ct. at 2796.

4. The Court recognized that some theories may be too new, or too specialized to have been published, so lack of publication is not dispositive. Nevertheless, "submission to the scrutiny of the scientific community is a component of 'good science,' in part because it increases the likelihood that substantive flaws in methodology will be tested." *Daubert,* 509 U.S. at 593, 113 S.Ct. at 2797.

5. "Widespread acceptance can be an important factor in ruling particular evidence admissible, and 'a known technique that has been able to attract only minimal support within the community,' ... may properly be viewed with skepticism." *Ibid.*

## II. Silicone–Induced Autoimmune Disease—General Causation

### a. The Immune System

The body has two modes of self-protection from outside disease causing organisms: nonspecific defenses and the immune system.[6] The nonspecific defenses include macrophages which are large cells that literally engulf a foreign particle and eat it. In addition, a tissue reaction known as a foreign body granuloma commonly occurs whereby so-called "giant" cells wall off or encapsulate the intruder with a meshlike fibrous tissue, to prevent any spread of the invader to surrounding tissue.

The "immune system" involves specific responses to specific invaders (antigens) from outside the body. Lymphocytes (white blood cells) travel throughout the body and are genetically programmed to recognize various antigens and attack them with antibodies. Macrophages assist in this process by eating the foreign particles and by displaying some of their antigen meal on their cell surface where the lymphocytes can spot them. The lymphocytes then release chemicals that mobilize the macrophages to even greater appetites. "Adjuvants" are substances that enhance the immune response by increasing the macrophage and some of the lymphocyte functions. Once exposed to a specific antigen, the lymphocytes retain the memory of the antigen and are on standby for its return.

While most antigens exist outside the body, some natural antigens exist within our own cell structure. An important function of a healthy immune system is to recognize those antigens as 'self' and not attack them. If the immune system loses this ability to separate friendly antigens from foreign ones, the body will then produce antibodies that in effect attack its own tissue (autoantibodies) which can produce autoimmune diseases.

### b. Silicone generally

Silicone is used in pacemakers, heart valves, eye lenses, artificial joints, chin, breast and penile implants, surgical tubing, mesh, shunts, sponges and is also used to lubricate syringes and IV needles.[7]

Silicone is used because "it is considered to be relatively inert chemically, is easily sterilized, retains its functional characteristics for long periods, usually is not rejected by the host and has not been found to cause any malignancies in humans."[8]

As it turns out, silicone is not entirely inert but, like other foreign invaders, triggers a defensive body reaction. In a case study of solid elastomer implants, urologist David Barrett of the Mayo Clinic,[9] found that fibrous capsules form around the implants along with foreign body granulomas. In nearly all the cases, there was also a small amount of shredded silicone particles outside the capsule with some migration to the nearby draining lymph nodes.[10] The authors noted, however, that human adjuvant disease (autoimmune disease) had not developed in any of the patients and found no evidence that this tissue response had any negative effect on the body. Another urologist reviewing this study opined that the fibrous capsule around the implant probably keeps most of the silicone particles inside and that the particles found in the lymph nodes came from ingestion by macrophages and their migration.[11] Five of the defendant's experts de-

---

6. This explanation is drawn primarily from Marieb, *Essentials of Human Anatomy & Physiology*, 4th Edition (1994). Other helpful information came from Kossovsky & Heggers, "The Bioreactivity of Silicone," 3 *CRC Critical Reviews in Biocompatibility* 1, p. 58–63 (1987), Defense Memorandum, Vol. V, Exh. 17, and the affidavits of several defense experts: toxicologist Dr. Ronald Gots, Defense Memorandum, Vol. II, Exh. 7, p. 17; pathologist, Dr. Elliott Kagan, Exh. 9, p. 5–6; and rheumatologist, Dr. Jack Waxman, Exh. 15, p. 4–5.

7. Defense Memorandum, Vol. II, Exh. 7, p. 13; Exh. 15, p. 4. See Vol. V, Exh. 17, p. 53.

8. Barrett, et al. "Particle Shedding and Migration from Silicone Genitourinary Prosthetic Devices," 146 *Journal of Urology* 319 at 319 (1991), Defense Memorandum, Vol. V, Exh. 2.

9. See footnote 8.

10. No tissue from beyond those nodes was biopsied so the extent of dissemination is unknown from this study.

11. Lewis, "Long–Term Results of Penile Prosthetic Implants" 22 *Urologic Clinics of N. America* 847, 855 (1995), Defense Memorandum, Vol. V, Exh. 19.

scribe Barrett's findings as neither novel nor surprising since they simply indicate the body's defenses were functioning normally, walling off the foreign entity and disposing of the minute particles through the macrophages in the lymph nodes.[12]

#### c. Silicone autoimmune disease

PICK's claim is that the silicone in Barry Pick's implant caused him to develop autoimmune diseased,[13] varyingly described by plaintiff's witnesses as "siliconosis" and "silicone induced immune deficiency," "silicone disease for want of (formal) designation" and a "systematic inflammatory illness" caused by the silicone devices.[14] The plaintiff witnesses have different theories on how this occurs.[15]

Plaintiff's designated primary witness on this claim, Dr. Andrew Campbell, describes the disease as a "multi-system disorder" which has no "specific diagnostic criteria" and for which he himself has not even attempted to develop diagnostic criteria; nor does he know if the syndrome has been recognized by any medical association.[16] Dr. Britta Ostermeyer who proffers herself as an expert in autoimmune disease, describes it as a "novel syndrome," an "atypical new disease entity" for which no diagnostic criteria has yet been developed.[17] Dr. Ostermeyer, for example, attributes broad, generic symptoms to this condition, some actually contradictory to each other, including muscle aches, joint pain, swelling and stiffness, dry eyes and mouth, rashes, cold hands and feet, headaches, backaches, hair loss, numbness, tingling, burning sensations, vision problems, diarrhea, constipation, loss of appetite, weight gain and hormonal problems.[18]

#### d. Scientific methodology and silicone

The parties disagree on what type of scientific methodologies are valid as a basis for an opinion on disease causation in a court of law. AMS maintains that epidemiological studies are required by the Fifth Circuit and that an opinion unsupported by such data is inadmissible speculation. PICK relies on the clinical method of differential diagnosis and case study analysis.

**12.** Defense Memorandum, Vol. II, Exh. 4, p. 3, urologist William Furlow; Exh. 8, p. 4, AMS biochemist Robert Grant; Exh. 10, p. 11–13, urologist Terrence Malloy; Exh. 13, p. 15, immunologist John Salvaggio; Exh. 15, p. 5–6, rheumatologist Jack Waxman. See also plaintiff witness, Dr. Pierre Blais, Vol. I, Exh. 2, 11/12/95, p. 3.

**13.** Also known as human adjuvant disease and connective-tissue disorder.

**14.** Defense Memorandum, Vol. III, Exh. 6, p. 169; Exh. 8, p. 400; Vol. 1, Exh. 20, 12/21/95; Exh. 21, 12/13/95, p. 1.

**15.** One theory apparently is that the silica in the filler of the implant escapes and triggers the development of autoantibodies, Plaintiff's Memorandum, p. 5–6, p. 8; "Examination under Oath of Douglas R. Shanklin, M.D." p. 20–22, p. 31–41, p. 112–113; Defense Memorandum, Vol. 1, Exh. 20, 11/9/95; Vol. IV, Exh. 27, p. 170–175, p. 178–179; see also Defense Memorandum, Vol. V, Exh. 17 and "Human Adjuvant Disease, Possible Autoimmune Disease After Silicone Implantation: A Review of the Literature, Case Studies, and Speculation for the Future," 78 *Plastic and Reconstructive Surgery* 1 (1986).

Dr. Campbell opines that the constant immune stimulation from the foreign implant (triggering macrophage and lymphocyte activity) eventually wears the immune system down causing it to be unable to distinguish self form non-self and therefore it starts generating an attack on its own tissue. Plaintiff Memorandum, Exh. 2, Sworn Statement of Dr. Andrew Campbell, p. 41–44.

**16.** Defense Memorandum, Vol. III, Exh. 8, p. 400–402.

**17.** Vol. I, Exh. 21, 12/13/95, p. 1; Vol. IV, Exh. 28, p. 130–131, p. 284–286.

**18.** Defense Memorandum, Vol. IV, Exh. 28, p. 283. Dr. Campbell provides a similar lengthy list: fatigue, muscle and joint ache, malaise, sleep disturbances, hair loss, memory loss, rashes, loss of balance, tingling, numbness, frequent bouts with colds and flu, constipation and diarrhea. Plaintiff Memorandum, Exh. 2, Sworn Statement of Dr. Andrew Campbell, p. 10–13.

A District Court in Oregon recently ruled under *Daubert* that expert testimony at trial relating to the existence and causation of silicone-related autoimmune disease was inadmissible on the basis that it is "at best an untested hypothesis." *Hall v. Baxter Healthcare Corp.*, 947 F.Supp. 1387, 1402 (D.Or.1996). This Court is sympathetic to the reasoning but is not prepared to join in the ruling.

### (1) Epidemiological evidence

[1, 2] Epidemiological studies assess general causation via statistical probability, comparing the incidence of a particular disease in. people exposed to a particular substance as opposed to people not so exposed. *Brock v. Merrell Dow Pharmaceuticals, Inc.*, 874 F.2d 307 (5th Cir.1989), *modified on other grounds*, 884 F.2d 166 (5th Cir.1989), *cert. denied*, 494 U.S. 1046, 110 S.Ct. 1511, 108 L.Ed.2d 646 (1990). Epidemiologists use a variety of information sources, including medical records, questionnaires, clinical observations and surveys. Epidemiological studies fulfill the *Daubert* criteria. A hypothesis—does a substance cause a particular disease—is tested through the comparative survey. Epidemiological studies are reported in peer-reviewed journals [19] and the methodology is widely accepted as scientifically valid.

■ As noted, AMS takes the position that epidemiological evidence is *required* by the Fifth Circuit before an hypothesis can be considered scientifically valid in a court of law, citing *Brock, supra*.[20]. This Court disagrees. In *Brock*, the court stated that epidemiological proof was "the most useful and conclusive type of evidence" but specifically stated that they were not holding that it is a "necessary element in all toxic tort cases." *Brock*, 874 F.2d at 313. In *Brock*, the only other evidence consisted of animal studies of questionable usefulness.[21]

Other courts have more clearly stated that epidemiological evidence is not essential for an expert opinion to be admissible in a case such as this:

> As long as the basic methodology employed to reach such a conclusion is sound, such as use of tissue samples, standard tests, and patient examination, products liability law does not preclude recovery until a "statistically significant" number of people have been injured or until science has had the time and resources to complete sophisticated laboratory studies of the chemical.

*Ferebee v. Chevron Chemical Co.*, 736 F.2d 1529, 1535–1536 (D.C.Cir.1984), *cert. denied*, 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984); *Wells v. Ortho Pharmaceutical Corp.*, 788 F.2d 741, 745 (11th Cir.1986), *cert. denied*, 479 U.S. 950, 107 S.Ct. 437, 93 L.Ed.2d 386 (1986); *Bowers v. Northern Telecom, Inc.*, 905 F.Supp. 1004, 1010 (N.D.Fla.1995). See also *Benedi v. McNeil–P.P.C., Inc.*, 66 F.3d 1378, 1384 (4th Cir.1995).

Nevertheless, AMS is correct that epidemiological data is very important. It appears undisputed that no epidemiological study has yet been done finding that silicone penile implants increase a person's risk of acquiring an autoimmune disease. What has been studied, however, is the long-term effects of silicone *gel* breast implants on the immune system.[22] A number of such studies have been conducted and, with the exception of one, have found no association between silicone gel and the development of

---

19. A difficulty exists with the concept of "peer review." True peer review means that a scientific hypothesis is subjected to independent evaluation by other scientists in that particular field, typically by independent testing and replication of the results. Pre-publication "editorial peer review," on the other hand, usually consists of sending the proposed article to several outside reviewers who comment on its content and make a recommendation on publication. It is simply not feasible for the editorial staff or the outside reviewers to attempt to replicate the author's findings prior to publishing them. See *Valentine v. Pioneer Chlor Alkali Co., Inc.*, 921 F.Supp. 666, 674–675 (D.Nev.1996). Consequently, just because an article is published in a prestigious journal, or any journal at all, does not mean per se that it is scientifically valid.

20. PICK points out that *Brock* is a pre-*Daubert* decision; however, *Daubert* cited *Brock* approvingly. *Daubert*, 509 U.S. at 595, 113 S.Ct. at 2798. See also *LeBlanc v. Merrell Dow Pharmaceuticals, Inc.*, 932 F.Supp. 782, 784 and n. 4 (E.D.La.1996).

21. In *Allen v. Pennsylvania Engineering Corp.*, 102 F.3d 194 (5th Cir.1996). *Allen* repeated *Brock's* endorsement of epidemiological evidence as the "most useful and conclusive type of evidence," *Allen*, 102 F.3d at 197. But again the court relied on a combination of factors, including the lack of epidemiological support, inconclusive animal studies and no evidence of the level of the exposure by the deceased to the alleged toxin.

22. The appropriateness of comparing silicone gel to elastomer will be discussed in the "case study" section, infra.

autoimmune or connective tissue disorders.[23] The defense witnesses consider the two best designed and most authoritative of these studies to be that of the Mayo Clinic in Minnesota[24] and the Nurses Health Study in Boston.[25] In both studies, no statistically significant connection was found between the implants and connective tissue disease or its symptoms.[26]

Plaintiff witness, Dr. Campbell, criticizes the studies on the basis that, among other things, the individual patients were not examined and only certain connective tissue diseases were included.[27] A published article by several doctors with the U.S. Food and Drug Administration also criticized the Mayo Clinic study for having too small a sample size to pick up rare results and too short a duration to detect problems with longer latencies and likewise criticized the Nurses' Health Study for using a technique that likely resulted in under-reporting of symptoms.[28] The same article reviewed all the various studies and concluded that while no substantial increase in the risk of *well-recognized*

connective tissue diseases appeared associated with gel implants, none of the studies specifically addressed atypical connective tissue disease and symptoms, rendering any results in that regard inconclusive.

The only epidemiological study which found some statistical connection between silicone gel and autoimmune disease was conducted by Dr. Charles Hennekens of the Harvard Medical School.[29] This study involved nearly 400,000 women who filled out questionnaires regarding their medical and health history. Patients with breast implants were, to a statistically significant degree, more likely to report having a connective tissue disease. The estimated increased risk was small and the authors suggested that the reported connection might not be real since the study was done during a period of large-scale publicity regarding the alleged dangers of such implants, which could have resulted in selective participation or overreporting by women having such symptoms. In any event, the authors did conclude that the study excluded *large* risks of connective

23. Defense Memorandum, Vol. II, Exh. 7, p. 27–31; Exh. 15, p. 7–9; Silverman, et al., "Reported Complications of Silicone Gel Breast Implants: An Epidemiologic Review," 124 *Annals of Internal Medicine* 8 (1996) (attached to the plaintiff memorandum); Hennekens, et al., "Self–Reported Breast Implants and Connective Tissue Diseases in Female Health Professionals. A Retrospective Cohort Study," 275 *JAMA* 616 (1996), Vol. V, Exh. 13.

24. Vol. II, Exh. 5, p. 28–29; Exh. 7, p. 28–29. "Risk of Connective–Tissue Disease and Other Disorders After Breast Implantation," 330 *New England Journal of Medicine* 1697 (1974). Vol. V, Exh. 12. The Mayo Study reviewed the medical records of approximately 750 women with breast implants and 1,500 women without, over an average period of 7–8 years.

25. Vol. II, Exh. 5, p. 29–30; Exh. 7, p. 28; Vol. V, Exh. 13. The Nurses' Health Study consisted of questionnaires and review of medical records of some 80,000 women over a 10 year period.

26. As a result of these studies, the American College of Rheumatology declared that silicone implants expose patients to "no demonstrable . . . risk for connective tissue or rheumatic disease." Defense Memorandum, Vol. II, Exh. 13, Attachment D.

27. Plaintiff Memorandum, Exh. 2, Sworn Statement of Dr. Andrew Campbell, p. 50—52; Def. Memorandum, Vol. V, Exh. 5, Brautbar & Campbell, "Silicone Implants and Immune Dysfunction: Scientific Evidence for Causation," 4 *International Journal of Occupational Medicine & Toxicology* 1 (1995). Defense witness Dr. Donald Goldman responds that the lack of actual patient examination strengthens validity since it reduces the danger of observer bias and that an appropriate range of connective diseases was in fact included. Vol. II, Exh. 5, p. 29–30.

28. Silverman, et al., "Reported Complications of Silicone Gel Breast Implants: An Epidemiologic Review," 124 *Annals of Internal Medicine* 8 (1996). Another critic raised the same complaints and also challenged the accuracy and impartiality of the Mayo Clinic study and the consistency, accuracy and impartiality of the Nurses' Study. Sheller, "Will the Real Junk Science Stand Up?" 4 *Mealey's Litigation Report: Breast Implants* 21 (Nov. 16, 1995). The Court notes that the author is a plaintiff's attorney involved in breast implant litigation. Other criticism of the Mayo Clinic study appear in Defense Memorandum, Vol. V, Exh. 20.

29. Hennekens, et al., "Self-Reported Breast Implants and Connective Tissue Diseases in Female Health Professionals. A Retrospective Cohort Study," 275 *JAMA* 616 (1996), Vol. V, Exh. 13; see also Vol. III, Exh. 5, p. 31–32; Exh. 7, p. 29–31.

tissue disease in connection with the implants.

■ In summary, the epidemiological evidence does not support PICK's claim that silicone can induce autoimmune disease. At the same time, from the *Daubert* standpoint, the methodology is arguably flawed due to the nature of the alleged disease and the design restrictions in the studies. Consequently, the epidemiological evidence does not definitively rule out such a connection. In addition, the Hennekens study does provide some evidence of a connection, even if slight and debatable.

AMS argues that the Hennekens study is inadmissible because it did not establish that the risk of contracting an autoimmune disease was more than double in the implant population than in the nonimplant population. Their argument is based on the epidemiological concept of "relative risk." It is calculated by dividing the number of cases where the disease occurred in the exposed group by the number of times it appeared in the nonexposed group. If the particular disease appears with the same frequency in both groups, the relative risk is expressed as 1.0. A relative risk less than 1.0 suggests no connection between the suspected cause and the disease; a risk greater than 1.0 suggests a causal connection. See *Turpin v. Merrell Dow Pharmaceuticals, Inc.*, 959 F.2d 1349, 1353, n. 1 (6th Cir.1992), *cert. denied*, 506 U.S. 826, 113 S.Ct. 84, 121 L.Ed.2d 47 (1992). A relative risk of 2.0 means that the disease occurs among the population exposed to the suspect cause *twice* as often or "double" that of the control population. "Phrased another way, a relative risk of 2.0 means that, on the average, there is a fifty percent likelihood that a particular case of the disease was caused by the event under investigation and a fifty percent likelihood that the disease was caused by chance alone. A relative risk

greater than 2.0 means that the disease more likely than not was caused by the event." *Manko v. United States*, 636 F.Supp. 1419, 1434 (W.D.Mo.1986); *aff'd*, 830 F.2d 831 (8th Cir.1987). See also *In re: Joint Eastern & Southern Dist. Asbestos Lit.*, 52 F.3d 1124, 1128 (2d Cir.1995); *Hall, supra*, 947 F.Supp. at 1400–1402.[30]

Since a relative risk of 2.0 equates to just a 50–50 likelihood that the disease in question was caused by the suspected exposure, AMS argues that the relative risk must be greater than 2.0 (more than "double") to fulfill the basic preponderance of the evidence standard that the disease was "more likely than not" caused by the exposure. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1321 (9th Cir.1995); *DeLuca v. Merrell Dow Pharmaceuticals, Inc.*, 911 F.2d 941, 958 (3d Cir.1990).

Evidence is admissible, however, if it has "any tendency" to prove or disprove a fact of consequence in the case. Fed.R.Evid. 401. A relative risk above 1.0 is statistically significant, even if not sufficient, by itself, to establish causation by a preponderance of the evidence. See *Brock*, 874 F.2d at 312.

Presumably the plaintiff would only attempt to introduce the Hennekens study, if any, and such would be relevant and admissible.

e. Case studies

■ Case studies assess general causation by the accumulation of individual cases showing the same connective pattern between a particular cause and effect. Case studies employ valid scientific methodology. A certain hypothesis is "tested", by examining a series of individuals, their or lack of exposure to certain substances and their comparative symptoms. The hypothesis is can be retested by conducting the same review of other individuals.[31]

---

**30.** See also Defense Memorandum, Vol. II, Exh. 5, p. 26. Epidemiologists also calculate a "confidence interval" to provide an assessment of the statistical reliability of the relative risk. *Turpin*, 959 F.2d at 1353, n. 1.

**31.** Dr. Campbell argues that case studies can fulfill the so-called Hill criteria. Without getting into a lengthy discussion, this Court agrees with

AMS that the Hill criteria are factors for evaluating epidemiological findings, not anecdotal case studies. For PICK's position, see Plaintiff Memorandum, p. 3; Exh. 2 (Sworn statement of Dr. Campbell), p. 71, p. 73–75. See also Defense Memorandum, Vol. V, Exh. 5, p. 10–11. For AMS' position, see Vol. II, Exh. 5, p. 25–27; Exh. 7, p. 25–28; see also 31 *Hous. L.Rev.* 1241, 1273–1275 (1994); 74 *Mass. L.Rev.* 169, 176 (1989);

The fact that such studies frequently appear in medical journals also satisfies *Daubert* and establishes that case studies are well-accepted in the scientific community as valid methodology.

On the other hand, case studies suffer from methodological flaws. Case study populations are frequently small, leaving open the real possibility that the findings are due to chance rather than to exposure to the suspected substance. Another criticism is that the symptoms are often subjective on the part of the patient, susceptible to exaggeration or outright falsity (particularly if litigation is contemplated). Another problem that affects PICK's evidence is potential bias. Doctors who specialize in certain conditions, such as PICK's witnesses do with regard to silicone-related ailments, attract patients with those symptoms. When they engage in litigation or otherwise have their livelihood dependent upon it, the danger of bias, conscious or unconscious, increases.[32]

Finally, courts have frequently rejected case studies as an insufficient basis to decide causation when they lack control groups. *Hall, supra,* 947 F.Supp. at 1408; *Muzzey v. Kerr–McGee Chemical Corp.,* 921 F.Supp. 511, 519–520 (N.D.Ill.1996); *Casey v. Ohio Medical Products,* 877 F.Supp. 1380, 1384 (N.D.Cal.1995).

■ There are also particular problems with the case studies that the plaintiff intends to rely upon, namely those dealing with silicone *gel* common in breast implants. It appears undisputed that no published case

studies exist which indicate that silicone *elastomer* in penile implants triggers the development of autoimmune disease.[33] PICK's experts themselves have had only minimal experience with penile implants. For example, Dr. Campbell has seen "several thousand" breast implant cases but has had less than 10 patients with a penile implant; Dr. Ostermeyer has dealt with 3,000–4,000 women with breast implants but only about 15 patients with penile implants; Dr. Puszkin has reviewed over 1,700 breast implant cases but this was only his second experience with a penile implant.[34] On the other hand, three of the defense's urologists over the past 20+ years have collectively implanted over 7,500 penile implants with no reported complications from the autoimmune disorders.[35] Likewise, the urologist who implanted Pick's prothesis and the urologist who removed it some ten years later have had no other experience with a patient claiming to have contracted an autoimmune or silicone related disordered.[36]

PICK intends to rely upon case studies involving silicone *gel* implants, arguing that those results can be extrapolated to elastomer implants. That inferential leap is debatable.[37] The gel as a liquid obviously has a greater capacity to spill and spread throughout the body than does the solid elastomer which at best sheds particles. One study has shown, for example, that the amount of silicone in the tissue outside gel implants is 500 times greater than around elastomer im-

71 *N. C. L.Rev.* 247, 261, 266–268 (1972); 15 *Cardozo L.Rev.* 2139, 2166–2169 (1994).

32. Defense Memorandum, Vol. II, Exh. 7, p. 22–24.

33. Barrett, et al, found signs of normal foreign body reaction to the silicone implant, but no evidence of autoimmune disease. Other literature reviews regarding solid silicone implants found no increase in the incidence of autoimmune disease. Lewis, "Long–Term Results of Penile Prosthetic Implants," 22 *Urologic Clinics of North America* 847 (1995), Defense Memorandum, Vol. V, Exh. 19; Foliart, "Swanson Silicone Finger Joint Implants: A Review of the. Literature Regarding Long–Term Complica-

tions," 20A *Journal of Hand Surgery* 445 (1995), Exh. 9.

34. Defense Memorandum, Vol. III, Exh. 8, p. 332, p. 399–400; Vol. IV, Exh. 28, p. 124, p. 141; Vol. IV, Exh. 26, p. 92, p. 124.

35. Defense Memorandum, Vol. II, Exh. 4, p. 1, p. 3, Dr. William Furlow; Exh. 10, p. 2, p. 11, Dr. Terrence Malloy; Exh. 11, p. 1, p. 2, Dr. John Mulcahy.

36. Defense Memorandum, Vol. III, Exh. 1, p. 68–69, Dr. Neil Baum; Exh. 13, p. 24–25, Dr. Wayne Hellstrom.

37. Defense Memorandum, Vol. II, Exh. 5, p. 22; Exh. 7, p. 14–16; Exh. 13, p. 16; Exh. 15, p. 9–10.

plants.[38] Thus the 'dose' of silicone from a gel implant is significantly greater than from the shredded particles of an elastomer implant. Another scientist has found that silicone gel has a potent adjuvant effect on the immune system in animals but has found no such impact by elastomer.[39] As has already been noted, an actual study of shedding particles of silicone showed only a local nonspecific body reaction.[40] Furthermore, medical evidence indicates that women are more susceptible to developing autoimmune disease than men.[41] Finally, even one of the plaintiff's own witnesses, Dr. Pierre Blais, found the differences between the devices, their structure, the materials, the location of the implant so different than any comparison between the two was illogical and irrelevant.[42]

Nevertheless, this Court concludes that Daubert and the principles of relevancy under the Federal Rules of Evidence allow admission of these case study reports. Rule 401 mandates a liberal view of relevancy—evidence having "any tendency" to prove or disprove a fact is admissible. The evidence regarding silicone gel implant arguably has such a tendency.[43] Further-

more, the differences between gel and elastomer do not require overly technical understanding of scientific principles and are well within the capacity of a lay jury to understand and weigh accordingly.

There have been numerous case studies purporting to show a connection between silicone gel and autoimmune disease [44]. Nevertheless, the individual reports cited must be shown to be independently reliable under Daubert before they can be admitted. For example, Dr. Campbell himself has co-authored a number of studies based on his own patients, purporting to show abnormal immune activity.[45] Those studies rely on testing done by Immunosciences Laboratory, under the direction of Dr. Aristo Vojdani. As will be discussed infra, this Court concludes that several of Dr. Vojdani's tests do not comport with Daubert and therefore results from those tests would be inadmissible and those related studies would be likewise inadmissible.

### f. Differential diagnosis

■ Differential diagnosis is "a patient-specific. process of elimination that medical

---

**38.** Defense Memorandum, Vol. II, Exh. 5, p. 22; Exh. 7, p. 15–16; Peters, et al., "Analysis of Silicon Levels in Capsules of Gel and Saline Breast Implants and of Penile Prostheses," 34 *Annals of Plastic Surgery* 578 (1995), Vol. V, Exh. 24.

**39.** Naim, et al, "Breast Implants and Connective–Tissue Disease," 331 *New England Journal of Medicine* 1231 (1994), Def. Memorandum, Vol. V, Exh. 20, p. 6–7; also Naim & Lanzafame, "The Adjuvant Effect of Silicone–Gel on Antibody Formation in Rats," 22 *Immunological Investigations* 151 (1993), Vol. V, Exh. 21.

**40.** See footnote 6 and accompanying text.

**41.** Defense Memorandum, Vol. II, Exh.7, p. 16.

**42.** Defense Memorandum, Vol. III, Exh. 4, p. 412–413.

**43.** As AMS correctly points out, the American College of Rheumatology has declared that silicone implants pose no demonstrable risk for autoimmune disease and that "(a)necdotal evidence should no longer be used to support this relationship in the courts or by the FDA." Vol. II, Exh. 13, Attachment D. The Court appreciates the legal advice but nonetheless concludes *Dau-*

*bert* and Rule 401 allow admission of the evidence.

**44.** A published review, co-authored by Dr. Campbell, summarizes many of those studies. "Silicone Implants and Immune Dysfunction: Scientific Evidence for Causation," 4 *International Journal of Occupational Medicine and Toxicology* 1, p. 3 (1995), Defense Memorandum, Vol. V, Exh. 5.

**45.** "Immune Functional Impairment in Patients with Clinical Abnormalities and Silicone Breast Implants," 8 *Toxicology & Industrial Health* 6 (1992), Plaintiff Memorandum, Exh. 2, Sworn Statement of Dr. Andrew Campbell, Attachment 2, discussed at Exhibit 2, p. 52–58; "Antibody to Silicone and Native Macromolecules in Women with Silicone Breast Implants," *Journal of Immunopharmacology and Immunotoxicology* (1994), Plaintiff Memorandum, Exh. 2, Attachment 4, discussed at Exh. 2, p. 58–63; "Neuroimmunologic Evaluation of Patients with Silicone Implants," 4 *Journal of Occupational Medicine & Toxicology* 1 (1995), Plaintiff Memorandum, Exh. 2, Attachment 5, discussed at Exh. 2, p. 63–68; "Immunologic and Biologic Markers for Silicone," *Toxicology and Industrial Health* (1994), Plaintiff Memorandum, Exh. 2, Attachment 6, discussed at Exh. 2, p. 68–70.

practitioners use to identify the 'most likely' cause of a set of signs and symptoms from a list of possible causes." *Hall, supra,* 947 F.Supp. at 1413. The physician should consider the history of the patient's symptoms, review his outside records, conduct a physical examination and laboratory testing, then evaluate all the possible causes of the condition, based on his medical training and available information, ultimately selecting a diagnosis which best fits all the findings. A variety of courts have held, and this Court agrees, that differential diagnosis meets the *Daubert* criteria. *In re: Paoli Railroad Yard PCB Lit.,* 35 F.3d 717, 758 (3d Cir. 1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1253, 131 L.Ed.2d 134 (1995); *Wilson v. Petroleum Wholesale, Inc.,* 904 F.Supp. 1188, 1190 (D.Colo.1995). See also *Joiner v. General Electric Co.,* 78 F.3d 524, 530–533 (11th Cir.1996); *Benedi,* 66 F.3d at 1384; *McCullock v. H. B. Fuller Co.,* 61 F.3d 1038, 1043–1044 (2d Cir.1995).

■ Dr. Campbell is the only physician being offered by the plaintiff as a witness on the silicone theory and as a physician, he is the only one qualified to use the method of differential diagnosis in his research. He is board certified in family practice.[46] While he began his career as a family practitioner, he developed a specialty in immunotoxicology and currently about 80–90% of his practice is in the latter area.[47] His own research has been through his clinical practice with his patients.[48]

Dr. Campbell does have substantial experience with women who have silicone implants. His stated methodology in evaluating those patients clearly comports with the accepted practice of differential diagnosis: medical history and records, standardized laboratory tests and a physical examination.[49]

On the issue of general causation, the Court finds that Dr. Campbell is qualified to testify regarding the clinical symptoms he has seen in women with breast implants. He is likewise qualified to testify regarding studies and data he relied upon, with the exception of the tests of Immunosciences Laboratory which the Court has ruled invalid.

*Evaluation*

The overall problems with the general causation theory of silicone-induced autoimmune disease was well summarized in *In re Breast Implant Cases,* 942 F.Supp. 958, 960 (E. & S.D.N.Y.1996):

> The hundreds of symptoms associated with this undifferentiated disease, the lack of any acceptable agreed upon definition, the inadequacy of any satisfactory supporting epidemiological or animal studies, the lack of a scientifically acceptable showing of medical plausibility, and the questionable nature of the clinical conclusions of the treating doctors, all point to a failure of proof in making a prima facie case that silicone implants cause any of the syndromes claimed except for local disease.

Nevertheless the district courts in those cases did not grant summary judgment for the defense. The judges deferred because a national committee of experts has been judicially appointed in connection with major breast implant litigation in Alabama, their work not as yet completed. "It is possible that further information will in time support plaintiffs' general systemic claims sufficiently to permit a jury trial." *Breast Implant,* 942 F.Supp. at 961. Similarly, Judge Robert Jones, in Oregon, while granting summary judgment for the defense deferred the effective date of the ruling pending the report of the national committee. *Hall, supra,* 947 F.Supp. at 1411.

In our case, since summary judgment will be granted as to specific causation, it is not necessary to rule on the matter of general causation. That motion is therefore deferred. In the event this Court's decision is reversed on appeal, the motion for summary judgment as to general causation may be reurged.

---

**46.** Vol. III, Exh. 8, p. 272.

**47.** Vol. III, Exh. 7, p. 137–139.

**48.** Vol. III, Exh. 8, p. 285.

**49.** Plaintiff Memorandum, Exh. 2, Sworn Statement, p. 21–24.

## III. SILICONE–INDUCED AUTOIMMUNE DISEASE—SPECIFIC CAUSATION

■ Proof of causation has two components, general and specific. General causation deals with whether the substance at issue, i.e. silicone, can cause diseases or disorders in people in general. Specific causation focuses upon whether the substance, i.e. silicone, was in fact the cause of the ailments or symptoms in the particular patient. The Court's analysis above dealt with the issue of general causation and what evidence was admissible, under *Daubert*, to establish that connection. Assuming, but without deciding, that the evidence which has been ruled admissible above would be sufficient to go to the jury on the question of general causation, the plaintiff's claims must also produce sufficient admissible evidence on specific causation to survive dismissal of their claims.

### Dr. Aristo Vojdani [50]

■ Dr. Vojdani is the general supervisor and co-owner of the Immunosciences Laboratory in Beverly Hills, California.[51] He has a Ph.D. in immunology and microbiology and is not a medical doctors.[52] His self-stated expertise for this case is in the immunology of silicone as reflected in laboratory results.[53]

In 1995, Immunosciences Laboratory did an analysis of Pick's blood, running a total of 67 different immunological tests. Sixty of the tests resulted in normal findings. Only seven of the tests scored in the abnormal range [54].

For some of the tests conducted, the laboratory obtained kits from outside manufacturers which provided a known standard for the ingredient to be tested, and included a reference range for what would be a negative, normal or positive finding. All of those test results came back normal.[55]

For a number of the other tests, Dr. Vojdani obtained sera from outside manufacturers, but generated *his own* reference range for normal and abnormal.[56] Pick's test results were then evaluated according to that internal calculation. Dr. Vojdani claimed his internal testing procedure is "much more sensitive" than that done by the other laboratories but he could not cite any particular medical text to justify his processes.[57] He also indicated that certain of the Immunosciences Laboratory testing procedures had been evaluated favorably by the College of American Pathologists but acknowledged that about half of the tests done on Pick are not and were not in fact surveyed by the College. He has applied to have the Immunosciences Laboratory accredited by the College of American Pathologists but so far it has not been.[58]

Regardless of the above, most of Pick's tests that were done through the Immunosci-

---

50. AMS is critical of several of PICK's experts because of their substantial involvement in silicone-related litigation. This potential bias is relevant to undermine credibility at trial but it does not negate their qualifications to testify.

51. Vol. IV, Exh. 29, p. 11–12.

52. Vol. IV, Exh. 29, p. 77.

53. Vol. IV, Exh. 29, p. 105, p. 227.

54. Vol. I, Exh. 23; Vol. IV, Exh. 29, p. 242–243; see also Vol. III, Exh. 5, p. 37–38.

55. Vol. IV, Exh. 29, p. 243–244; p. 117.

56. He developed this internal procedure through a comparison with blood analysis previously obtained from 520 women with silicone breast implants who were symptomatic and 520 women presumably without implants who were apparently healthy. Vol. IV, Exh. 29, p. 127; p. 138–

139. The women in the control group were referred by physicians who had seen them for check-ups and considered them healthy. They were asked if they had any diseases. Vol. IV, Exh. 30, p. 57–70. The medical histories of the women in the "symptomatic group" were reviewed by Dr. Campbell and another physician and included the wide range of general complaints previously cited, including fatigue, stiffness, insomnia, attention deficit and night sweats. Vol. IV, Exh. 30, p. 116. Defense experts, Dr. Donald Goldman, an epidemiologist, and Dr. Ronald Gots, a toxicologist, criticize the validity of the control group since the women were not asked about health in general, medical history, recent blood work, any medications or even if they had an implant themselves. Vol. II, Exh. 5, p. 33; Exh. 7, p. 36.

57. Vol. IV, Exh. 29, p. 131–132.

58. Vol. IV, Exh. 29, p. 177–179; Exh. 30, p. 127–128.

ences Laboratory internally created variations in the testing protocol, registered in the normal range.[59]

One of Dr. Vojdani's in-house tests which registered in the abnormal positive category, was in the autoimmune panel dealing with the anti-striated muscle.[60] This was an important test because Dr. Campbell relied upon it in rendering his opinion that silicone contributed "significantly" to Pick's health problems.[61] Dr. Vojdani purchased serum from an outside manufacturer for the anti-striated muscle antibody and the manufacturer apparently provided a reference range of 1 to 40. Rather than use that range, however, Dr. Vojdani generated *his own* standard curve, resulting in a reference range of 1 to 20. After the test was run, Pick's score was 30, which Dr. Vojdani acknowledged would be within normal limits as far as the manufacturer's range was concerned, but was an abnormal positive finding under his own internally generated range.[62] Noteworthy is that Dr. Vojdani conceded that even his test result did not necessarily indicate any evidence of disease.[63]

Another of his tests was for so-called silicone antibodies, a test Dr. Vojdani developed himself.[64] According to him, there is no outside kit for those antibodies and therefore no manufacturer reference range exists.[65] On two of the four tests Dr. Vojdani conducted in that category, Pick scored in the abnormally positive range. Dr. Vojdani acknowledged that his silicone antibody test is not a diagnosis of disease, is not used by any other

pathology lab for diagnosing disease nor has there been any published literature promoting the test as a diagnostic measure.[66] He also acknowledged that there is no published validation of a silicone antibody.[67] Nor has Dr. Vojdani sought to externally validate the specificity or sensitivity of the test.[68] When asked how he does validate his test results, he stated that he compares it with the internal samples he has from the women patients with silicone breast implants and from the control group with no silicone antibodies.[69] Noteworthy is that the silicone equivalent that he uses for his antibody test is the parent compound of silicone *gel;* he has not done any experiments or studies with silicone *elastomer* to determine if his antibody test is appropriate in measuring an immune response.[70]

Lastly, but perhaps most significantly of all, Dr. Vojdani himself acknowledges that the "pathological meaning of these antibodies is not clear" even while it indicates to him an "immunological response" to the silicone.[71]

In 1996, the Food and Drug Administration issued a notice critical of silicone antibody testing in general as their "diagnostic accuracy is not established, and the value and usefulness of these tests remain speculative."[72] The College of American Pathologists likewise has issued a statement criticizing such tests as "not currently indicated or useful for purposes of medical management of individual breast implant recipients," concluding that such tests provide "no findings

---

59. See, for example, the tests involving the anti-phospholipid for lipid antibodies and myelin basic protein tests. Vol. 1, Exh. 23; Vol. IV, Exh. 29, p. 135–137; p. 140–141; p. 146–147.

60. Vol. I, Exh. 23.

61. Vol. 1, Exh. 4, 2/24/95; Vol. III, Exh. 7, p. 93.

62. Vol. I, Exh. 23; Vol. IV, Exh. 29, p. 130–135.

63. Vol. IV, Exh. 29, p. 244–245.

64. Vol. I, Exh. 23; Vol. IV, Exh 29, p. 113–115; Exh. 30, p. 86.

65. Vol. IV, Exh. 29, p. 144.

66. Vol. IV, Exh. 29, p. 233–235; Exh. 30, p. 177.

67. Vol. IV, Exh. 30, p. 159–160.

68. Vol. IV, Exh. 30, p. 153–154. Defense expert, Dr. Donald Goldman, suggests this validation is not possible since an objective. clinical definition of silicone-mediated immune dysfunction does not exist nor have there been adequate controls included in the published laboratory studies. Vol. III, Exh. 5, p. 34.

69. See footnote 14; Vol. IV, Exh. 30, p. 98–99.

70. Vol. IV, Exh. 30, p. 102; p. 107; p. 173; p. 179.

71. Vol. I, Exh. 23, comments to "Silicone Antibody Test."

72. Defense Memorandum, Vol. II, Exh. 13, Attachment C.

uniquely indicative or supportive of purported silicone induced autoimmune disease in implant recipients." [73]   Apparently the Center for Disease Control and Prevention has issued a similar advisory.[74]   Finally, at least one other researcher who had initially reported finding such silicone antibodies by a test similar to Dr. Vojdani's, later retracted those conclusions after further experimentation.[75]

*Evaluation*

The laboratory results in which Pick allegedly scored in the abnormal range are inadmissible under *Daubert.*   The methodology used by Dr. Vojdani, including his internally-generated references ranges and his creation of a silicone antibody test, have not been established as independently reliable and trustworthy.[76]

*Dr. William J. Morton*

■   Dr. William Morton is a urologist who performed a biopsy on tissue from Pick's penis in 1995 to determine whether silicone was present.[77]   Pick was still living and the implant had been removed several years before.   Dr. Morton sent several pieces of the tissue to pathologist, Dr. James Bootle, for analysis.   The ultimate diagnosis was "fibrovascular tissue with focal foreign body giant cell reaction to crystalline material." [78]

Dr. Morton indicated that Dr. Bootle told him the crystalline substance was silicone.[79]   Dr. Bootie has testified that he did not tell Dr. Morton the substance was silicone.   At some later point, *Dr. Morton* told *Dr. Bootle* that the tissue contained silicone.[80]

Dr. Morton indicated it is too early in the scientific knowledge to say what silicone causes and that giving an opinion regarding silicone and human adjuvant disease would be speculation [81].

*Evaluation*

Dr. Morton is qualified to testify as a urologist regarding the biopsy he performed on tissue from Pick's penis.   He may also comment on the *written* findings by the pathologist, Dr. Bootle.   Additionally, Dr. Morton may not give an opinion regarding the relationship between silicone and Pick's various symptoms since, by his own admission, such testimony would be speculation.

*Dr. Benjamin Benjamin*

■   Dr. Glasgow is an eye pathologist who did a post-mortem examination of Pick's eyeballs.   He diagnosed mild focal, chronic iridocyclitis and choroiditis (inflammation of the iris and the choroid tissue in the eye).[82]

PICK claims that Dr. Glasgow's findings of eye inflammation is consistent with silicone induced autoimmune disease, but Dr. Glasgow himself considered his findings insignificant.   He described the inflammation as "minimal"—meaning very few inflammatory cells—and "focal"—meaning in a limited part of the eye.   He made "very little out of it."   He stated that such findings are "very, very commonly" seen in patients postmortem without any eye disease.[83]   He could attribute no diagnostic significance to the finding.[84]   In particular, he could not classify either eye as being affected by autoimmune disease [85] and when asked specifically if the inflammation could be *un*related to autoimmune disease, his response was "absolutely." [86]

**73.**   Vol. V, Exh. 40.

**74.**   Defense Memorandum, Vol. II, Exh. 5, p. 35.

**75.**   Defense Memorandum, Vol. II, Exh. 12, p. 3; Exh. 13, p. 13 and Attachment B.

**76.**   See also *Cabrera v. Cordis Corp.,* 945 F.Supp. 209 (D.Nev.1996) where Dr. Vojdani's silicone antibody test was likewise ruled inadmissible under *Daubert.*

**77.**   Vol. 1, Exh. 18, Dunwoody Medical Center, 02–21–95; Vol. IV, Exh. 23, p. 117.

**78.**   Vol. 1, Exh. 18, Final Report.

**79.**   Vol. IV, Exh. 23, p. 167–168.

**80.**   Vol. III, Exh. 5, p. 34–36.

**81.**   Vol. IV, Exh. 23, p. 211, p. 216.

**82.**   Vol. I, Exh. 9.·

**83.**   Vol. III, Exh. 11, p. 67–69.

**84.**   Vol. III, Exh. 11, p. 72–74.

**85.**   Vol. III, Exh. 11, p. 81.

**86.**   Vol. III, Exh. 11, p. 74.

*Evaluation*

Dr. Glasgow, as an eye pathologist, is qualified to discuss his eye examination and his findings. Since his findings are apparently of no clinical significance, he is not qualified, nor does he indicate any inclination, to render an opinion that Pick's symptoms were consistent with an autoimmune disease.

*Dr. Terry E. Burris*

■ Dr. Terry E. Burris is an ophthalmologist who examined PICK's eyes in June, 1995. He diagnosed PICK with "moderate to severe keratoconjunctivitis sicca (dry eyes)." In his report, he stated that the condition was "typical" of autoimmune-mediated disease of the lacrimal glands.[87]

Dr. Burris concluded that the silicone in the penile implant was the "most probable" cause of Pick's condition citing, in part, the results of Pick's immunologic work-up at the Immunosciences Laboratory, indicating that Pick had an abnormal immune reaction to silicone.[88] As has already been noted, those lab results are unreliable under *Daubert.*

Subsequent to his written report, but prior to his deposition, Dr. Burris reviewed the findings of Dr. Benjamin Glasgow which Dr. Burris said was indicative of a chronic autoimmune inflammation.[89] However, as already noted, Dr. Glasgow himself considered his findings insignificant.

According to defense witnesses Dr. Penny Asbell, an ophthalmologist, Dr. Elliott Kagan, a clinical pathologist, and Dr. Jack Waxman, a rheumatologist, a biopsy of the lacriminal (tear) and salivary glands can determine conclusively if an autoimmune disease process has occurred by the concentration of lymphocytes (white blood cells).[90] Plaintiff pathologist, Dr. Rahim Karjoo, did such an examination and found no abnormalities in either gland, and in particular no inflammation, "minimum lymphocytic infiltration" and no sign of silicone or its related forms.[91]

Ultimately, Dr. Burris, various comments regarding the possible cause of PICK's dry eye condition are, by his own candid admission, beyond his area of expertise. He indicated repeatedly that he is not qualified to draw such a conclusion. His diagnosis is simply "dry eyes" and he relies upon a rheumatologist to determine what the etiology of the disease is.[92] He does not hold any degrees or certifications in autoimmune disease or immune dysfunction and does not consider himself an expert in silicone, in any form.[93] He has not done any studies linking silicone to autoimmune disease. None of the tests he ran were silicone specific; the. tests simply document the presence of dry eyes and cannot establish that silicone was the cause of the problem.[94]

87. Vol. III, Exh. 6, p. 125, p. 168–169. The plaintiff states that Dr. Burris actually diagnosed Pick with atypical Sjorgren's, a particular autoimmune disease. In fact he did not, noting that Sjorgren's is an extremely rare condition in males and could only be diagnosed after all other possibilities are eliminated. Vol. III, Exh. 6, p. 178.

88. Vol. III, Exh. 6, p. 179–180, p. 210–217. Dr. Burris also reviewed a report by Dr. Smalley. However, Dr. Smalley has not been offered as an expert in this case nor has any report or deposition of his findings or opinion been provided so his input is disregarded.

89. Vol. III, Exh. 6, p. 56–57.

90. Vol. II, Exh. 1, p. 3–4; Exh. 9, p. 4–5; Exh. 15, p. 11.

91. Vol. 1, Exh. 15, items F & G; Vol. IV, Exh. 21, p. 178–183, p. 218–219, 266–267. Defense

pathologist Kagan also examined the eye tissue and found no evidence of autoimmune disease. Vol. II, Exh. 9, p. 4–5.

92. Vol. III, Exh. 6, p. 171–172; p. 192; p. 195–196; p. 216; p. 217–218; 231.

93. Vol. III, Exh. 6, p. 122–123.

94. Vol. III, Exh. 6, p. 159; p. 204–205. Noteworthy is that Dr. Burris himself acknowledges that a number of conditions can cause dry eyes, conditions that existed with PICK. For example, Dr. Burris agrees that a number of the medications that PICK took on a regular basis can cause dry eyes and smoking cigarettes can aggravate the condition. Vol. III, Exh. 6, p. 129; p. 134–135; p. 137; see also p. 175–176. He acknowledged that Hodgkin's disease can cause dry eyes as does malnutrition. Vol. III, Exh. 6, p. 137–139.

*Evaluation*

As an ophthalmologist, Dr. Burris can testify as to his diagnosis of "dry eyes." He is not qualified to give an opinion as to the cause of the condition.

Even if Dr. Burris were qualified to render an opinion as to causation, the Court would find that the information he relied upon—in particular the unvalidated results of the Immunosciences Laboratory and the results of Dr. Glasgow's post-mortem examination—are insufficient to sustain a conclusion that Pick's eyes were afflicted with autoimmune disease. This is particularly true in light of Dr. Karjoo's and Dr. Kagan's post-mortem pathological examination which found no evidence of such a condition.

*Dr. Andrew Campbell*

Dr. Campbell never met, much less examined, Barry Pick [95] nor was he obviously ever Pick's treating physician.

■ In February and March, 1995, Dr. Campbell submitted expert opinions regarding Pick's condition, based on a review of various medical records and pathology reports [96]. He opined that "silicone's toxic reactions" contributed "significantly" to Pick's health problems, referring specifically to laboratory testing done that showed that Pick had "immune and autoimmune reactions with silicone antibody formation." He identified the penile implant as the source of the silicone, based upon pathology reports from a penile biopsy. Finally, he stated that his opinions were based upon "reasonable medical probability."

The test results Dr. Campbell relied upon came in part from Immunosciences Laboratory in California. More specifically, Dr. Campbell relied upon a lab result which indicated that Pick had an autoimmune reaction in his anti-striated muscle.[97] Dr. Campbell

conceded he had no knowledge of the validity of the tests conducted.[98] As was discussed in connection with Dr. Vojdani, that lab test does not comport with *Daubert* standards.

The pathology report Dr. Campbell relies upon was prepared by Dr. William Morton. The report refers to crystalline material found in the penile biopsy along with foreign body cell reaction. Dr. Campbell presumes this to be silicone from the implant., although the pathology report does not say so.[99]

In his initial deposition in November of 1995, Dr. Campbell identified Pick's disease as an immune disregulation that caused chronic disease. He specifically stated that he did not believe Pick really had an autoimmune disease [100].

In his second deposition, Dr. Campbell concluded Pick did have an autoimmune disease, based on an opinion by ophthalmologist Dr. Terry Burris that Pick's eye problems were the result of an autoimmune reaction.[101] As already discussed, Dr. Burris is not qualified to make such a diagnosis.

*Evaluation*

Dr. Campbell may not render an opinion as to Barry Pick's specific condition as his diagnosis is not based on sound methodology. Differential diagnosis presumes that a sufficient and valid clinical investigation has been conducted. *In re Paoli*, 35 F.3d at 758–760; *Dennis v. Pertec Computer Corp.*, 927 F.Supp. 156, 161–162 (D.N.J.1996). In this case, Dr. Campbell never personally examined Barry Pick. The test results he relied upon from the Immunosciences Laboratory do not pass the *Daubert* test. Likewise the opinion of Dr. Burris that he cited fails *Daubert* since Dr. Burris was not qualified to render a diagnosis of autoimmune disease. Finally, even assuming the crystalline substance found by Dr. Morton's pathology re-

95. Vol. III, Exh. 7, p. 119–120.

96. Vol. I, Exh. 4. 2/24/95 and 3/16/95.

97. Vol. III, Exh. 7, p. 93.

98. Vol. III, Exh. 7, p. 94–95; Exh. 8, p. 462.

99. Vol. I, Exh. 18, "Final Report" Dunwoody Medical Center; Vol. III, Exh. 7, p. 99; also Exh. 8, p. 299–300.

100. Vol. III, Exh. 7, p. 123–124.

101. Vol. III, Exh. 8, p. 227, p. 230.

port was silicone [102], that fact alone is insufficient to sustain a valid differential diagnosis.

### Dr. Britta Ostermeyer Shoaib

██ Dr. Ostermeyer is the director of silicone clinical research at Comprecare Clinic in Houston, Texas [103]. Prior to her employment there, she was for several years a research associate and student with a doctor who specialized in patients with silicone breast implants [104].

Dr. Ostermeyer states that she has an expertise in autoimmune disease and the "novel syndrome" related to silicone devices [105]. She alleges a familiarity with the history, physical symptoms, examination and laboratory findings of patients who develop such diseases [106]. As already noted, she attributes a wide variety of symptoms to this condition [107].

While Dr. Ostermeyer lists herself as an "M.D." on the Comprecare stationary [108], she is not in fact licensed to practice medicine in the United States. She was licensed as a physician in Germany in 1995 but must undergo at least three additional years of training in this country before she is eligible for licensing to practice medicine here [109]. By her own admission, she is not qualified to give a medical diagnosis or treat patients. She states that she is allowed to see patients for research purposes, "taking documentation."[110]

### Evaluation

Dr. Ostermeyer is qualified to describe her documentary findings in connection with patients she has interviewed and examined. However, by her own admission, she is not qualified to give a medical diagnosis. Consequently, while she may describe the symptoms of the patients she has examined, she may not render an opinion regarding whether any of those patients, including Pick by analogy, suffered from any silicone-related disease or any other particular disease or disorder.

### Dr. Douglas Shanklin

██ Dr. Shanklin is a pathologist who considers himself an expert on tissue reaction to silicone and the immunopathology of silicone based on his experience with silicone gell [111].

Dr. Shanklin did a postmortem examination of tissue from Pick's lower body. Dr. Shanklin reported finding small granulomas in the tissue along the spermatic duct containing smaller amounts of silicone and crystalline silica. He states that the presence of the granulomas is "proof of an immunopathic process." [112] He also found small deposits of silica in the periaortic and mesenteric tissues which are about a foot away from the implant site. In his subsequent report, he states that to a "reasonable medical certainty" the implant was the proximate cause of Pick's ailments.[113] Dr. Shanklin identifies the silica by polarization microscopy, a process that apparently used light and reflected light.[114]

102. The Court is aware that Dr. Shanklin and Dr. Puszkin purported to identify the substance as silicone, infra.

103. Vol. IV, Exh. 28, p. 67–68.

104. Vol. IV, Exh. 28, p. 69–79, p. 81–82, p. 84.

105. Vol. IV, Exh. 28, p. 130–131, p. 135; Vol. I, Exh. 21.

106. Vol. I, Exh. 21; Vol. IV, Exh. 28, p. 184–185.

107. Vol. I, Exh. 21; Vol. IV, Exh. 28, p. 283. Dr. Ostermeyer acknowledges that a lot of medications can cause the symptoms she describes, and that many other factors can affect the immune system, such as Hodgkin disease, chemotherapy, radiation, severe malnutrition, stress, mental and personality disorders and smoking. Vol. IV, Exh. 28, p. 292–340.

108. Vol. I, Exh. 21.

109. Vol. IV. Exh. 28, p. 64–65.

110. Vol. IV, Exh. 28, p. 67, p. 170.

111. Defense Memorandum, Vol. IV, Exh. 27, p. 149; p. 123–124.

112. Defense Memorandum, Vol. 1, Exh. 20.

113. Defense Memorandum, Vol. I, Exh. 20, 12/21/95.

114. Vol. IV, Exh. 27, p. 178–179. See also "Examination under Oath of Douglas R. Shanklin,

His identification is visual only and therefore subjective to the extent that he bases it on what the images look like as opposed to performing an actual chemical analysis.

PICK contends Dr. Shanklin's evidence is significant as it shows that silica from the implant had broken off and migrated to Pick's lower torso and that there was evidence of autoimmune disease in the lower torso blood vessels. AMS claims that polarization examination is unduly dependent on the judgment of the observer and is inadequate as compared to other methods which can definitively identify the material. In particular, defense witness Dr. Elliott Kagan argues that Dr. Shanklin did not use appropriate and approved analytical methods, approved by the National Institute of Occupational Safety and Health.[115] Dr. Shanklin responded to that particular criticism by acknowledging the advances in identification techniques but claimed his visual method, because of his experience, is sufficient[116].

*Evaluation*

Dr. Shanklin is qualified as a pathologist to give his opinion regarding the analysis of Pick's tissue. The technology he used, polarization microscopy, while perhaps not the most sophisticated, appears to be sufficiently reliable under *Daubert* to be admissible.[117]

*Dr. Saul Puszkin*

▉ Dr. Puszkin has a Ph.D. degree in biochemistry from the National University of Argentina[118] and "training" as a pathologist[119]. He is not a physician and as such is not licensed, by his own admission, to render a medical diagnosis[120].

Dr. Puszkin evaluated Pick's penile tissue slides taken during Dr. Morton's biopsy[121]. The histological examination disclosed fibrovascular tissue and signs of chronic inflammation. Foreign body type giant cells were also present, as well as lymphocytic infiltrates, and the cellular elements were "consistent with silicone" as the foreign material[122]. A microscopic examination[123] revealed "significant amounts of silicone particles infiltrating the penile fibrous tissue" the location of which indicated that the particles had migrated from the implant[124]. The surrounding tissue formed a granuloma, encapsulating the particles in fibrous tissue. He found no evidence of a migration of the silicone to other organs or tissue in Pick's body[125].

Similarly to Dr. Shanklin, all of Dr. Puszkin's findings are derived from visual and morphological (relating to form and structure) observations[126]. On several occasions, in the early 1990's, Dr. Puszkin did a follow-up analysis of the substance being viewed to confirm his visual identification. He has not done that validation in several years, however, and did not do it with Pick's tissue samples[127]. Consequently, while in his report he states that he found significant amounts of silicone particles, he is inferring the foreign

M.D.", a plaintiff exhibit, at p. 96–98; p. 102–103.

**115.** Dr. Kagan is board certified in Anatomic and Clinical Pathology as well as Immunology. Defense Memorandum, Vol. II, Exh. 9. The various techniques are listed in his affidavit at p. 6.

**116.** "Examination under Oath of Douglas R. Shanklin, M.D." p. 105–107.

**117.** Several defense witnesses are critical of Dr. Shanklin's various claims regarding crystalline silica, amorphous silica, how they are created and their effects. Vol. II, Exh. 7, p. 18; Exh. 8, p. 6; Exh. 9, p. 6, n. 3. Those criticisms go more to the conclusions he has drawn, rather than his methodology, and are beyond the scope of *Daubert*.

**118.** Vol. IV, Exh. 26, p. 24.

**119.** Vol. IV, Exh. 26, p. 27; p. 39; p. 80. In *Cabrera, supra,* Dr. Puszkin was identified as

having a Ph.D. in neuroscience with over 20 years experience in pathology and immunology.

**120.** Vol. IV, Exh. 26, p. 50; p. 79.

**121.** Vol. IV, Exh. 26, p. 129–130, p. 132–133.

**122.** Vol. I, Exh. 19.

**123.** Dr. Puszkin's methodology involved a technique called "bright field microscopy", "phase contrast microscopy" and "dark field microscopy." Vol. IV, Exh. 26, p. 93–94.

**124.** Vol. I, Exh. 19. By "significant", Dr. Puszkin meant an amount between "small" and "moderate." Vol. IV, Exh. 26, p. 149–150.

**125.** Vol. IV, Exh. 26, p. 154.

**126.** Vol. III, Exh. 26, p. 148.

**127.** Vol. III, Exh. 26, p. 96–97, p. 99, p. 112–113.

material is silicone through his subjective visual evaluation [128].

AMS criticizes Dr. Puszkin's academic credentials, his integrity with regard to apparently unrelated research and the subjective nature of his visual identification.

*Evaluation*

Dr. Puszkin appears to be qualified as a pathologist, at least by experience if not formal education, and may therefore describe his findings regarding Pick's tissues [129]. His optical methodology is admittedly subjective but that basic technique is a common scientific method of examination. Any challenge to the conclusions he draws is beyond the scope of *Daubert*. The other challenges to his qualifications are more relevant to weight than admissibility.

*Dr. Rahim Karjoo*

Dr. Karjoo is a pathologist who did a postmortem examination of Pick's body tissue.

■ Dr. Karjoo identifies his relevant expertise as his ability through optical, morphological means to identify silicone in tissue [130]. With respect to his examination, Dr. Karjoo analyzed a small lymph node from the groin area and found foamy histiocytes (macrophages). Based upon his experience with breast implants, he would expect that the cells could be carrying silicone but he could find no silicone in his microscopic examination [131]. Dr. Karjoo also noted that such foamy histiocytes can be found in a normal lymph node.[132]

The tear, salivary and adrenal glands showed no relevant abnormalities, in particular, no inflammation, minimum lymphocytic (white blood cells) infiltration and no sign of silicone or its related forms.[133] Dr. Karjoo likewise found no silicone, or its related forms, in the tissue sample from PICK's brain, muscle, liver, bone or lung.[134]

With respect to the penile tissue, the pathology report stated that "many particles of regular crystalloid materials (silicone)" were found, along with scar tissue, inflammatory cells and giant cells with foreign body granuloma. The report also noted that the "presence of crystalloid material of silicone varies in volume and amount in different microscopic fields, and a few microscopic fields show streams of silicone in the tissue." [135] The diagnostic section of the report notes the "(p)resence of stream of silicone gel and silicone particle" adjacent to the foreign body granuloma formation as well as giant cells, most of which contained silicone, signs of chronic inflammation and histiocytes mostly adjacent to the silicone particles and "presence of silicone lakes" surrounded by fibrous tissue without inflammation [136]. He saw no silicone in any of the blood vessel [137].

AMS highlights Dr. Karjoo's description of the silicone as a "stream", "lake" and "gel", implying that Dr. Karjoo's findings are invalid since the silicone in Pick's implant was in solid, not liquid form. In explaining his terminology, however, Dr. Karjoo made it clear that "streams" and "lakes" of silicone did not mean he believed they were in liquid (gel) form. A stream meant the silicone particles

---

128. Vol. III, Exh. 26, p. 135–136.

129. The defense is critical of Dr. Puszkin's alleged lack of credentials and specifically cites incidents where Dr. Puszkin was formally sanctioned for "misconduct in research." Defense Memorandum, p. 21. These matters are properly the subject of cross-examination.

130. Vol. IV, Exh. 22, p. 321.

131. Vol. I, Exh. 15, E; Vol. IV, Exh. 21, p. 212–213.

132. Vol. IV, Exh. 21, p. 215.

133. Vol. 1, Exh. 15, items F, G, D; Vol. IV. Exh. 21, p. 178–182; p. 210–212; p. 218–220. This finding is significant in discounting any claim

that Pick's eye dryness resulted from autoimmune disease. See the discussion under Dr. Terry Burris.

134. Vol. IV, Exh. 21, p. 224; p. 227; p. 258–260.

135. Vol. 1, Exh. 15, L, p. 5. Various of the defense experts are critical of the notion that silicone could be present in a crystalline form. See Vol. II, Exh. 7, p. 18; Exh. 8, p. 5–6; Exh. 9, p. 6–7; Exh. 15, p. 19, n. 19. The Court does not have enough information to resolve this dispute but its resolution is not necessary for any of the Court's conclusions.

136. Vol. I, Exh. 15, L, p. 7–8.

137. Vol. IV, Exh. 21, p. 275.

were sitting next to other.[138] Silicone lakes meant spaces filled with silicone surrounded by fibrous tissue [139]. His specific reference to silicone "gel" was intended to mean that what he saw visually was similar to what he had seen in his breast implant cases [140].

With respect to the foreign body granuloma and giant cells, these occur to surround foreign material generally, leaving fibrous or scar tissue which Dr. Karjoo acknowledged is beneficial since it walls off the foreign object [141]. Also, evidence of particles in Pick's penile tissue immediately surrounding the area of the implant is not surprising and is consistent with and expected in an implant that has been in place that many years [142].

### Evaluation

Dr. Karjoo is qualified to give the results of his examination. The criticisms leveled by the defense go more to his conclusions than his methodology.

### Dr. Pierre Blais

■ Dr. Blais has a Ph.D. in chemistry. He acknowledges he is neither a physician nor a clinician and cannot testify as to the cause of Pick's ailment [143].

Dr. Blais' opinion focuses on the mechanics of the implant and its alleged poor design. The fact that it was made of silicone is irrelevant—"It could have been made of anything you wish." [144]

AMS argues that Dr. Blais' testimony is irrelevant.

### Evaluation

The Court agrees Dr. Blais' testimony is irrelevant and therefore inadmissible.

**138.** Vol. IV, Exh. 21, p. 242

**139.** Vol. IV, Exh. 21, p. 277–278.

**140.** Vol. IV, Exh. 21, p. 274–275; p. 279–280.

**141.** Vol. IV, Exh. 21, p. 239, p. 241–242; p. 278; Exh. 22, p. 441–442.

**142.** See the general discussion regarding immunological reactions. Also, Vol. II, Exh. 8, p. 4; Exh. 9, p. 5–6.

**143.** Defense Memorandum, Vol. III, Exh. 2, p. 76–78.

**144.** Vol. III, Exh. 2, p. 83–84.

### ·Dr. Dale Haufrect

■ Dr. Haufrect is a neurologist who examined Pick in 1995. Pick's results were nearly all within the normal range [145], including no indication of swollen lymph nodes which could have been indicative of a systemic infection [146]. The only finding that was abnormal was the mental status examination where the doctor concluded Pick suffered from major depression and an anxiety disorder [147].

Due to the nature of Pick's complaints, and because he had had a silicone implant, Dr. Haufrect ordered a "SPECT scan" which he stated has frequently shown—an estimated 60% of the time—abnormal blood flow patterns to the brain in patients with silicone gel implants. The SPECT span was done and came back normal [148]. In the "impressions" section of his report, Dr. Haufrect listed Pick's various subjective complaints, most of which could not be verified by his neurological examination [149].

In his report, Dr. Haufrect referenced the reports of Dr. Campbell and Dr. Puszkin as well as others that related silicone to neurological and other health problems. At his deposition, Dr. Haufrect clarified that he was referring to the effects of silicone gel and not solid elastomer [150]. He himself stated that from his own clinical experience and conversations with other physicians, he is unaware of any linkage between silicone penile implants and neurological problems [151]. When asked specifically if he would attribute any of his findings in his examination of Pick to the

**145.** Vol. I, Exh. 13; Vol. III, Exh. 12, p. 51–55; p. 58–63; p. 65–72; p. 87–88; p. 90.

**146.** Vol. III, Exh. 12, p. 54.

**147.** Vol. III, Exh. 12, p. 63–64; p. 81–82.

**148.** Vol. III, Exh. 12, p. 82–85.

**149.** Vol. I, Exh. 13; Vol. III, Exh. 72–81.

**150.** Vol. III, Exh. 12, p. 90; p. 91.

**151.** Vol. III, Exh. 12, p. 97.

silicone implant, Dr. Haufrect replied "I don't know." [152]

*Evaluation*

The doctor is qualified as a neurologist to discuss his examination. He does not purport to have an opinion regarding the causes of Pick's complaints and therefore may not testify as to any connection between them and the silicone implant.

## IV. SILICONE–INDUCED AUTOIMMUNE DISEASE—SUMMARY JUDGMENT

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The party seeking summary judgment bears the initial burden of informing the court of the basis for its motions and identifying those portions of record which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp., v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Once a proper motion has been made, the non-moving party may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts showing the existence of a genuine issue of fact for trial. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53. Factual questions and inferences are viewed in the light most favorable to the nonmovant. *Rogers v. Int'l Marine Terminals, Inc.,* 87 F.3d 755, 758 (5th Cir.1996). Summary judgment is mandated if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to her case on which she bears the burden of proof at trial. *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552.

■ With respect to general causation, the Court assumes, without deciding, that the admissible evidence after the *Daubert* analysis is sufficient to survive summary judgment. The evidence as to specific causation, however, is not. Summary judgment is appropriate because the admissible evidence after the *Daubert* analysis fails to meet the threshold requirement of proof that Barry Pick's ailments or symptoms were caused or aggravated by an immune disease or dysfunction, much less one caused by the silicone in his implant [153].

The admissible evidence as to specific causation is as follows:

—In 1995, Dr. Vojdani's lab conducted a series of tests on Pick's immune system; the tests that are admissible all scored Pick within the normal range;

—In 1995, Dr. Burris diagnosed Pick with "dry eyes" which is caused by a variety of possible conditions;

—Dr. Glasgow and Dr. Karjoo did a postmortem analysis of Pick's eyes and found no evidence of autoimmune disease;

—Dr. Karjoo's postmortem analysis also found no sign of silicone or immune dysfunction in Pick's brain, muscle, liver, bones, or other glands examined;

—Dr. Morton's biopsy of tissue from Pick's penis in 1995 found fibrous tissue and giant cell reaction;

—Dr. Shanklin, Dr. Puszkin and Dr. Karjoo examined the area around the implant site and found fibrous tissue, giant cells with foreign body granulomas and traces of silicone; no migration of silicone beyond a foot of the implant was uncovered.

It is uncontroverted that defensive body reaction to an intrusion of foreign particles into the body is normal and expected. This normal reaction includes the formation of fibrous or scar tissue, the creation of granulomas and the triggering of macrophage digestion and migration. What Drs. Morton, Shanklin, Puszkin and Karjoo discovered appears to be nothing more than the evidence of a normal foreign body reaction to the

---

**152.** Vol. III, Exh. 12, p. 91–92.

**153.** In light of this ruling, it is not necessary to rule on whether summary judgment is also appropriate on the basis that PICK's evidence failed to exclude a myriad of other possible causes of

Pick's symptoms, including many that pre-existed the implanting of the prothesis. That evidence, to say the least, is compelling and could well provide a separate and independent ground for summary judgment.

implant, an attempt by the body to wall off or separate the foreign material from the body and/or to digest and dissolve it. These types of reactions are similar to what occurs when anything, such as a piece of dirt, is lodged under the skin and are not evidence of an autoimmune disorder [154].

In granting summary judgment on this claim, the Court is not in any way purporting to rule on whether silicone-induced autoimmune disease does or does not exist, or whether the various methodologies ruled inadmissible under *Daubert* are in fact ultimately unreliable as diagnostic tools. That awaits further scientific exploration and evaluation. *Daubert* drew a distinction between "the quest for truth in the courtroom and the quest for truth in the laboratory." *Daubert*, 509 U.S. at 596–597, 113 S.Ct. at 2798. There well may be "authentic insights and innovations" of science that are nonetheless inadmissible in a courtroom. *Daubert*, 509 U.S. at 597, 113 S.Ct. at 2798–2799. What *Daubert* requires however is that a methodology be sufficiently validated by the scientific community before its results are admissible in a court of laws.[155]

*V. Systemic Coccal Disease*

The second of the plaintiff's two theories is that Barry Pick suffered from Systemic Coccal Disease (SCD). This is a theory of disease developed by Dr. Edward Hyman. Dr. Hyman is a physician, board certified in internal medicine and was Barry Pick's treating physician for a number of months prior to his death.

According to Dr. Hyman, bacteria enters the body from multiple sources, with most of the bacteria routinely killed off by the body's immune system. Some people, however, are unable to throw off the bacteria and it gets "seated." [156] The accumulated bacteria leads to a variety of ailments which he calls Systemic Coccal Disease.

With respect to its causes, Dr. Hyman admitted, "I can speculate, and that's all I can do." [157] Dr. Hyman does not know if it is a particular type of bacteria that gets seated or if it is ordinary bacteria that the host body, for whatever reason, is unable to fight off [158]. Dr. Hyman explains the characteristics of the disease as follows:

> ... it involves many, many organs in the body. And the more I study it, the more I find that another organ may be involved ... almost all of them have chronic fatigue. It's not a highly definitive finding because any chronic illness will make a person fatigued. But almost all of them have some fleeting arthritis. Some of it is not so fleeting. Some of it is highly localized. Almost all of them have muscle pain. Almost all of them have some mental confusion ... Some of them have lung damage. Some of them have heart damage [159].

Dr. Hyman also opined that weight loss is typical although sometimes the person develops a big appetite and gains weight [160]. He described SCD as a pattern of disease, although "(s)ometimes something is missing from the pattern." [161] He concedes that it is a "phenomenon I don't know the boundaries of." [162]

Dr. Hyman's experience with SCD is through his clinical practice treating individual patients, some 75% of which he believes have illnesses associated with this bacterial infection [163].

Dr. Hyman has published several articles regarding his theory of SCD and his method-

---

154. Vol. II, Exh. 7, p. 17, p. 35–36.

155. Likewise, the Court does not purport to find that the defendant has done all in its power to assure that its products are safe.

156. Vol. III, Exh. 15, p. 8–11.

157. Vol. III, Exh. 18, p. 112; see also Exh. 15, p. 7.

158. Exh. 15, p. 11–14.

159. Exh. 14, p. 60–61.

160. Exh. 14, p. 65.

161. Exh. 14, p. 61.

162. Exh. 17, p. 204–205.

163. Exh. 14, p. 23–24.

ology to detect it [164]. When asked if anyone other than himself has recognized the disease, Dr. Hyman could only cite Dr. Quentin Deming whom he claims had reproduced his results over a period of ten years [165]. He "doubts" that his theory is taught in any medical school [166].

As support for his hypothesis, Dr. Hyman cites older medical literature regarding delayed infection in the site of artificial heart valves. Since the infections did not result from the actual surgical procedure, the authors "postulated" that the bacteria came from the bloodstream [167]. Dr. Hyman nonetheless had to concede that the articles involved only a handful of case studies and the authors' theory on the delayed infection was speculation [168].

Dr. Hyman claims that while the term Systemic Coccal Disease is new, he has simply grouped together a lot of diseases having two things in common—similar symptoms and the illnesses subsiding when the bacteria is defeated [169]. According to him, SCD is a collection of all the diseases associated with asymptomatic bacteremia, bacteremia being defined as bacteria floating in the bloodstream.[170]

AMS points out that Systemic Coccal Disease is not listed as a disease in any medical treatise nor recognized as such in the medical community, with the exception of Dr. Hyman and Dr. Deming [171]. AMS also complains that with such broad and vague symptomatology, it has no diagnostic criteria by which it can be tested [172].

*Methodology*

Dr. Hyman's primary method of detecting SCD is through a analysis of the patient's urine for bacteria. By assessing the bacteria in the urine, particularly dead bacteria, he draws conclusions regarding bacteria circulating in the blood, which indicates to him the presence and strength of the disease.

An underlying theme of Dr. Hyman's methodology is his belief that technology predating the 1940's has more validity in this area than current methodology [173]. He bases this premise on what he contends is a pervasive misunderstanding of a study done in the 1950's by Dr. Edward Kass at Harvard University. Dr. Kass focused on the significance of bacteria that is able to grow freely in urine. Kass was dealing with urinary tract infections, according to Dr. Hyman, but his theory has been mistakenly broadened since then to hold that the *only* bacteria of significance in urine under any circumstances is that which can grow freely in that environment [174]. As a result, again according to Dr. Hyman, "every laboratory in the world has set-up their cultures so that they will ignore the bacteria that I see, completely ignore it." [175] Dr. Hyman decided to study this area, because he "never did believe the current teaching." [176]

With respect to his methodology in general, Dr. Hyman himself developed it about fifteen years ago, along with "some improvements which are stuck somewhere and filed in my mind that we use." [177] It is similar to technology predating the 1940's [178]. He

---

164. "A Urinary Marker for Occult Systemic Coccal Disease," 68 *Nephron* 314 (1994); "Improved Microscopic Detection of Bacteriuria," 67 *Biotechnic & Histochemistry* 1 (1992); "Computer Algorithm Offers a Comprehensive View of Quantitative Bacteriuria," 65 *Nephron* 549 (1993).

165. Exh. 14, p. 63–64; Exh. 18, p. 96.

166. Exh. 18, p. 96–97.

167. 17, p. 100–105.

168. Exh. 17, p. 105–106.

169. Exh. 18, p. 39.

170. Exh. 14, p. 218; Exh. 18, p. 40, p. 62.

171. Defense Memorandum, Vol. II, Exh. 7, p. 38; Exh. 13, p. 5; Exh. 14, p. 5–6; Exh. 15, p. 16.

172. Vol. II, Exh. 5, p. 4–7; Exh. 14, p. 9–10.

173. See, for example, Exh. 14, p. 135; p. 144.

174. Exh. 14, p. 14–17.

175. Exh. 17, p. 118–119; see also Exh. 14, p. 153; Exh. 17, p. 184–185.

176. Exh. 14, p. 8.

177. Exh. 17, p. 62–63.

178. Exh. 14, p. 135.

claims his methodology is "far more sensitive" than what is used in "routine laboratories" and can find "stealthy bacteria" that the routine laboratories cannot [179].

Dr. Hyman has apparently not conducted any blinded control study to test his conclusions [180]. He claims that validation by a control study is not "normal" practice in science and would constitute the very last step in the process [181]. He does nonetheless claim to doing his own version of a control study—via his clinical treatment. A patient who has not improved under standard treatment comes into his care, he treats the patient according to his theory and the patient improves. The patient returns to standard care and deteriorates again. That is his concept of a "control" study [182].

The specifics of his methodology follow.

### 1. *Use of centrifuge*

After obtaining a urine sample from the patient, the sample is divided into two portions of equal weight and placed in test tubes [183]. They're then spun in a centrifuge at a high rate of speed to separate the sediment to be analyzed [184]. Dr. Hyman acknowledges that standard medical labs often they don't centrifuge the sample at all [185]. Furthermore, Dr. Hyman centrifuges his samples at two or three times the normal speed. He claims the enhanced spinning doesn't impact the integrity of the sample [186].

When asked if he had done studies to that effect, he answered yes but when asked where they were, his answer was "in my head." [187]

### 2. *Culturing the sample*

At some point in the process, the sample to be analyzed least is grown in a medium. It's unclear whether this occurs before or after centrifuging, but the lack of clarity as to the timing is not significant for purposes of this analysis.

Dr. Hyman uses a commercial medium, but alters it and then incubates the culture longer than the standard time [188].

According to Dr. Hyman, virtually none of the hospitals in the country use his culturing method [189]. He claims his media, created according to techniques used in 1910 [190], are "more delicate" [191] and uses ingredients that are not used by any hospital laboratory in the world [192]. He contends the bacteria he is looking for will not grow in ordinary media, which is why a routine laboratory will find no growth and will issue a negative report [193].

### 3. *Use of a stain*

After centrifuging the sample, Dr. Hyman then places a dye in the urine tubes. According to him, it allows him to see the cells more clearly. When asked if using this dye

---

**179.** Exh. 14, p. 135, p. 22.

**180.** Vol. II, Exh. 14, p. 6–7. By control study is meant a comparison of the urine samples of a group of people presumably afflicted with SCD, compared to a group that is not. By blinded is meant that the person doing the urine analysis would not know from which group the samples came. See Vol. II, Exh. 5, p. 7, n. 2, p. 9; p. 11; Exh. 14, p. 7, n. 4. In supplemental filings, PICK has submitted documents indicated that Dr. Hyman's method will be used in a study of the ailments afflicting Gulf War veterans. That study has yet to begin, much less be completed and no validation can be assumed.

**181.** Exh. 17, p. 221, p. 222.

**182.** Exh. 17, p. 226–227.

**183.** Exh. 14, p. 104.

**184.** Exh. 14, p. 103.

**185.** Exh. 14, p. 110. Dr. Hyman blames the failure to centrifuge on the misinterpretation of Kass' theory, and adds "you find a wide teaching of that sort in various textbooks, all of which I think belong by the wayside ..." Exh. 14, p. 111–112.

**186.** Exh. 17, p. 236–237.

**187.** Exh. 17, p. 232.

**188.** Exh. 14, p. 154.

**189.** Again, he blames this upon the alleged misinterpretation of Kass' study. Exh. 14, p. 153.

**190.** Exh. 14, p. 151.

**191.** Exh. 15, p. 195.

**192.** Exh. 18, p. 67.

**193.** Exh. 15, p. 194.

was a standard sort of testing procedure that is ordinarily used, his answer was: "I don't think so."[194]

One sample he uses to analyze for bacteria. He places a buffer solution in the tube, redisburses the sediment and does that process at least twice. He then removes a portion, stains it and puts it under the microscope[195].

The testimony is unclear regarding this stain. At one point, Dr. Hyman states he uses the "universal" Gram stain that is "the most common stain in bacteriology."[196] At another point, he states that he does not use the Gram stain, but rather a "counterstain."[197] At still another point, he states that all his slides are created by a technology he's created; it's not the technology that's used elsewhere—the "preparation of it is different and unique."[198]

Regardless of the type of stain and how it is prepared, Dr. Hyman claims his process allows him to see bacteria which are not visible by normal testing methods. "No laboratory in the United States or in most any ... foreign country is going to find them, that's correct."[199]

4. *The scale of 0 to 4*

In inspecting the sample under the microscopic slide, Dr. Hyman uses his own makeshift scale of 0 to 4 to quantify the amount of various items he sees. For example, with respect to white blood cells, he would "take a guess" on his scale of 0 to 4 with 1 indicating a normal amount[200]. He uses the sample scale for spotting various types of cells[201].

Dr. Hyman acknowledges that regular laboratories do not use his 0 to 4 methodology[202]. He is openly critical of standard lab work, claiming it is usually done by technicians whose accuracy is poor; the methodology is sloppy and he generally ignores their results[203].

*Gram-positive cocci and "exploding cocci"*

After following his methodology, Dr. Hyman contends he can find gram-positive cocci which would not be visible under normal testing methods[204]. This finding indicates to him the person is sick, regardless of whether he appears to be healthy[205].

According to Dr. Hyman, he can also find so-called "exploded cocci" which he describes as rounded dead bacteria[206]. He takes credit for having discovered this particle that had never been previously described[207]. "[T]hey are bacteria, unequivocally bacteria. It's been proven. And it's my discovery."[208]

Dr. Hyman considers these "explo_eds" to be the marker for his Systemic Coccal Disease[209]. He uses the same 0–4 method to quantify the number of cocci that he sees[210].

When asked if he knew of any other laboratory using his testing procedures, he can only cite Dr. Quentin Deming[211].

In terms of treatment modality, Dr. Hyman does not have a specific protocol. He tries a particular antibiotic and if he seems to work, he purses it; alternatively, he tries another or mixes different combinations[212]. He evaluates the success of his treatment by

194. Exh. 14, p. 104, p. 105.

195. Exh. 14, p. 126–128.

196. Exh. 14, p. 129; p. 66.

197. Exh. 14, p. 122, p. 125.

198. Exh. 18, p. 198.

199. Exh. 17, p. 238.

200. Exh. 14, p. 108.

201. Exh. 14, p. 116–119.

202. Exh. 14, p. 110.

203. Exh. 14, p. 110–111.

204. Exh. 17, p. 236.

205. Exh. 14, p. 140; Exh. 15, p. 153.

206. Exh. 14, p. 120–121.

207. Exh. 14, p. 122; # 17, p. 190.

208. Exh. 14, p. 124.

209. Exh. 18, p. 69.

210. Exh. 14, p. 124.

211. Exh. 14, p. 133–134.

212. Exh. 14, p. 232.

the looking for Gram positive and exploded cocci in the urine [213].

While Dr. Hyman has declined to conduct blinded control studies of his procedures, one such study was done by the University of Texas. Dr. Hyman has been involved in the debate over the causes of the various persistent and seemingly unexplained physical complaints of returning Gulf War veterans. The Texas study used Dr. Hyman's urine sediment method and was designed to compare the test results of the afflicted veterans with a healthy control group. The test results were indistinguishable [214].

As with his theory of disease, Dr. Hyman's methodology evokes strong and consistent criticism from the defense experts: (1) other than Dr. Hyman and Dr. Deming, no other doctor, nor hospital nor medical laboratory recognizes his procedures as scientifically valid [215]; (2) Dr. Hyman has failed to conduct blinded control studies to validate his procedures [216]; (2) his procedures do not protect against contamination of the urine samples, i.e. in Pick's case, they were collected by Pick himself, at home, with no documented supervision [217]; (3) centrifuging the urine isolates and highlights contaminating organisms [218]; (4) his 1–4 scale is wholly subjective and unable to be validated by independent researchers [219]; (5) his claim that his theory is affirmed by positive results from treatment has not been documented and even assuming improvement occurs, he doesn't take into account the placebo effect, the body's own natural defenses or the other treatment the patient receives besides his antibiotics [220].

*Evaluation*

■ Assuming without deciding that Systemic Coccal Disease even exists, Dr. Hyman's methodology to detect it fails the *Daubert* test. By his own, and at times proud, admission his methodology is unique to him and Dr. Deming and runs counter to the established procedures of virtually all other laboratories and medical facilities, all of which he simply dismisses as being mistaken. His research is based on anecdotal case studies with no blind control validation. The one instance where his procedures were independently tested, the results failed to confirm the reliability of his unique testing procedures. While he has published his theory and methodology, it is undisputed that they have not been adopted by even a significant minority of the scientific community.

PICK argues that Dr. Hyman's procedure employs differential diagnosis, a valid methodology. In order to properly use that method, however, the diagnosis must be based on reliable information. It is clear that Dr. Hyman depends predominantly, if not almost exclusively, on his unique urine testing to make his diagnosis. By his own admission, the clinical symptoms he associates with SCD are so varied and general they cannot be corralled into a specific diagnostic criteria. Therefore, since his differential diagnosis relies upon information not shown to be objectively reliable for purposes of *Daubert*, his diagnosis is likewise inadmissible.

As Dr. Hyman's fundamental technology has not been shown to be reliable, it is not necessary to independently evaluate the balance of his theories, such as the claim that biofilm forms around the implant, impenetrable to antibiotics [221] or that the cocci he has

---

213. Exh. 14, p. 234–235.

214. Southern & Patel, "Examination of Urine Sediment by the Hyman Method Does Not Identify Individuals with Gulf War Syndrome," 44 *J. Investigative Med.* 12A (1996); Vol. II, Exh. 13, p. 6–7; Exh. 14, p. 8–9; Exh. 15, p. 16–17. PICK submitted supplemental materials indicating that Dr. Hyman's method will be tested in connection with the ailments suffered by returning Gulf War veterans. Since that study has not even begun, much less been completed, its results are purely speculative.

215. Vol. II, Exh. 7, p. 38; Exh. 14, p. 6.

216. Vol. II, Exh. 5, p. 7–9.

217. Vol. II, Exh. 5, p. 10; Exh. 14, p. 19–20. Urine samples should be obtained 'midstream' to assure integrity from outside contaminants. Exh. 5, p. 10–11.

218. Exh. 5, p. 10; Exh. 14, p. 14–15.

219. Vol. II, Exh. 14, p. 9, n. 6.

220. Vol. II, Exh. 14, p. 10–12.

221. Vol. I, Exh. 14, 3/9/95, p. 2–3.

discovered travels through the blood to the kidneys and other body organs[222]. Nor is it necessary to review the copious criticism of those aspects of his theory and methodology.[223] Likewise it is not necessary to review Dr. Hyman's particular findings with respect to Pick, nor the defense's response.[224]

*Dr. Quentin B. Deming*

Dr. Deming is a physician who has used Dr. Hyman's methodology and claims to have duplicated his results.[225] Dr. Deming's evidence suffers from the same *Daubert* flaws as Dr. Hyman's. He has not attempted to define Systemic Coccal Disease[226] and he readily acknowledges that their methodology is not part of the standard procedure used by physicians and hospitals[227]. When asked if he had ever compared the results in sick people with a control group of healthy people, he indicated he had looked at "some normals" and was currently doing some research in that area but the study has not been completed and the results so far are only "in (his) head."[228] Finally, unlike Dr. Hyman, Dr. Deming never met, much less examined, Barry Pick[229].

Consequently, Dr. Deming's testimony is inadmissible as based on a methodology not sufficiently validated to be considered scientifically reliable.

As with PICK's silicone theory, the Court does note again that this decision is not about who is ultimately right or wrong. Dr. Hyman and Dr. Deming may well be correct that Systemic Coccal Disease does in fact exist and his methodology may be able to reliably detect it. Further scientific study may well verify both. Nevertheless, *Daubert* requires a sufficient level of *established* validation before evidence can be admitted into a court of law.

## VI. Systemic Coccal Disease—Summary Judgment

Since the plaintiff's expert evidence regarding the diagnosis of Systemic Coccal Disease has been ruled inadmissible, summary judgment is appropriate for that claim as well both as to general causation and specific causation.

IT IS SO ORDERED.

---

**222.** Exh. 19, p. 8–9, p. 190–192; Exh. 20, p. 54–58.

**223.** With respect to the biofilm fostering infection, see Vol. II, Exh. 5, p. 19–21; Exh. 14, p. 16–17; Exh. 15, p. 18; with respect to whether Dr. Hyman's methodology fulfills Koch's postulates, Vol. II, Exh. 5, p. 15–16; with respect to Dr. Hyman's theory that the bacteria in the urine comes from the bloodstream through the kidneys, Vol. II, Exh. 5, p. 18; Exh. 9, p. 9; with respect to Dr. Hyman's staining procedures on the kidney tissue, Vol. II, Exh. 9, p. 9–10; Exh. 14, p. 15–16.

**224.** For example, Pick's bacterial urine count did not correlate with his clinical symptoms during the months he was under Dr. Hyman's care. Vol. II, Exh. 5, p. 13. In fact, Pick quit treatment with Dr. Hyman because he felt he was not improving, Exh. 14, p. 13.

**225.** Defense Memorandum, Vol. I, Exh. 7; also Vol. III, Exh. 9, p. 145–146.

**226.** Vol. III, Exh. 9, p. 183–184.

**227.** Vol. III, Exh. 9, p. 181–182, p. 204–207, p. 270–271.

**228.** Vol. III, Exh. 9, p. 374–376, also 146–153; p. 411–413.

**229.** Vol. III, Exh. 9, p. 118.